# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| AXHI SABANI, individually and on behalf of all others similarly situated, | ) ) ) Case No. _____ ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| TRANSITIONS OPTICAL, INC. and DOES 1-20, inclusive | ) ) ) |
| Defendants. | ) ) ) |

## NOTICE OF REMOVAL

Defendant Transitions Optical, Inc. ("Transitions"), by and through undersigned counsel and pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and 28 U.S.C. § 1453, gives notice that this civil case is hereby removed from the Circuit Court of the State of Wisconsin, Milwaukee County, Civil Division, to the United States District Court for the Eastern District of Wisconsin.

For this Notice of Removal, Transitions pleads as follows:

1.      This lawsuit is a class action within the meaning of 28 U.S.C. § 1453.

2.      On March 16, 2010, Plaintiff Axhi Sabani filed this case in the Circuit Court of the State of Wisconsin, Milwaukee County, Civil Division.  It was assigned Civil Action No. 10CV003808.

3.      Removal is timely under 28 U.S.C. § 1446(b).  Transitions was served a copy of the Summons and Class Action Complaint on April 1, 2010.  A true and correct copy of the Summons and Class Action Complaint, which constitute all process pleadings and orders that have been filed in this action are attached as composite Exhibit 1.

4.     The United States District Court for the Eastern District of Wisconsin is the district and division encompassing the place where the state court action is pending.

5.     A copy of this Notice of Removal will be served on counsel for the Plaintiff and will be promptly filed with the Circuit Court of the State of Wisconsin, Milwaukee County, Civil Division, as required by 28 U.S.C. § 1446(d).

6.     This lawsuit is brought by a putative representative person on behalf of a proposed class of individuals.  Compl. ¶ 12.  This is a putative class action in which the proposed class is defined as "[a]ll persons or entities in Wisconsin who acquired for their own use, and not for resale, photochromic lenses manufactured and/or distributed by one or more of the Defendants, or their agents or entities under their control, at any time from January 1, 1999 to the present (the "Class")."  Compl. ¶ 12.  As such, this matter is a purported class action as the term is defined pursuant to 28 U.S.C. § 1332(d)(l)(B).

7.     This action originally could have been filed in this Court pursuant to 28 U.S.C. § 1332(d), because the matter was brought as a class action, diversity of citizenship exists between one or more members of the class and Defendant, and the amount in controversy exceeds, in aggregate, $5,000,000 exclusive of interest and costs. Therefore, removal is proper pursuant to 28 U.S.C. § 1453.

## Jurisdiction

8.     A district court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) over class actions in which:

> the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which –
>
> (a)   any member of a class of plaintiffs is a citizen of a State different from any defendant;

(b) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(c) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

The grounds for removing this case are as follows:

**Amount in Controversy**

9. Plaintiff's complaint fails to allege the aggregate amount in controversy. While Plaintiff's complaint alleges that Plaintiff and class members each seek less than $75,000, Plaintiff makes no allegation regarding the aggregate amount of damages sought for the class as a whole. Compl. ¶ 7.

10. In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(6). Plaintiff does not claim that the aggregate amount in controversy is under $5,000,000, and Plaintiff has not stipulated that damages will not exceed this jurisdictional limit. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511-512 (7th Cir. 2007) ("If [plaintiff] really wanted to prevent removal, she should have stipulated to damages not exceeding the $75,000 jurisdictional limit."); *see also In re Shell Oil Co.*, 970 F.2d 355, 356 (7th Cir. 1992) ("Because jurisdiction is determined as of the instant of removal, a post-removal affidavit or stipulation is no more effective than a post-removal amendment of the complaint.").

11. While Transitions vigorously disputes Plaintiff's claims, the determination of the amount in controversy is based on a Plaintiff's allegations, not the damages in fact, if any exist. *See West Bend Elevator, Inc. v. Rhone-Poulenc S.A.*, 140 F.Supp.2d 963, 966 (E.D. Wis. 2000). Furthermore, because Plaintiff has made only a vague disclaimer about the amount of compensatory damages sought, the Court should accept a "good-

faith estimate" of the damages from Transitions if that estimate is "plausible and supported by a preponderance of the evidence." *See Oshana v. Coca-Cola Co.*, 472 F.3d at 511. Once Transitions has established the requisite amount in controversy, Plaintiff can only defeat jurisdiction if "it appears to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.*

12.     That the alleged amount in controversy exceeds $5 million is apparent from the following facts.

13.     Transitions does not sell any lenses directly to customers in the State of Wisconsin. However, many eyeglasses containing Transitions photochromic lenses are sold in the State (*see* Cole Decl. ¶ 4), and, indeed, these sales are the purported basis for the claims asserted in the Complaint.

14.     Approximately 3,848,300 photochromic Transitions lenses were sold in Wisconsin during the alleged class period. *See* Cole Decl. ¶ 3. Based on this volume of sales, Plaintiff would only have to demand an overcharge of less than $1.30 per lens from Transitions to put more than $5 million in damages at issue. *See* Bank Decl. ¶ 4.

15.     Moreover, Plaintiff seeks treble damages and attorneys' fees. Compl. ¶ 1. Both treble damages and attorneys' fees are appropriately considered in determining the amount in controversy.

16.     The Supreme Court has long held that, where attorneys' fees are allowed by statute, attorneys' fees should be considered part of the amount in controversy for jurisdictional purposes. *See Missouri State Life Ins. Co. v. Jones*, 290 U.S. 199 (1933); *see also Gardynski-Leschuk v. Ford Motor Co.*, 142 F.3d 955, 958 (7th Cir. 1998). The statute under which Plaintiff brings its complaint, the Wisconsin Antitrust Law,

specifically provides that a successful litigant may recover attorneys' fees. Wis. Stat. §133.18.

17.     Treble damages awards are also available under Wis. Stat. §133.18 and should be considered when calculating the amount in controversy. *See West Bend Elevator v. Rhone-Poulenc*, 140 F.Supp.2d at 967-68.

18.     When treble damages are included, Plaintiff would only need to allege an overcharge of $0.43 to exceed the $5 million amount in controversy. *See* Bank Decl. ¶ 6.

19.     The average cost to a direct customer (i.e., a lens caster, not a consumer) of the treatment manufactured and sold by Transitions is $10.78. *See* Cole Decl. ¶ 5. Thus, Plaintiff would only need to allege an overcharge of less than 4% of the total cost to exceed the $5 million amount in controversy, even lower if attorneys' fees are considered. *See* Bank Decl. ¶ 7.

20.     The percentage overcharge is even lower when compared to the typical cost to a customer of a pair of glasses containing photochromic treatments from Transitions. The prices of such glasses vary widely, but a reasonable average, at the low end, is about $250. *See* Cole Decl. ¶ 6. Since each pair of eyeglasses contains two lenses, Plaintiff would only need to allege an overcharge of 0.34% of the total cost to each customer to exceed the $5 million amount in controversy. *See* Bank Decl. ¶ 8.

21.     This overcharge of 0.34%, or even the higher number of 4%, both of which Transitions vigorously disputes in fact, are exceedingly low when compared to the percent overcharge typically alleged by plaintiffs in antitrust cases. *See, e.g.,* John M. Connor & Robert H. Lande, *How High Do Cartels Raise Prices: Implications for Optimal Cartel Fines*, 80 Tulane L. Rev. 513 (2005) (Plaintiff lawyers typically assert

that the relevant overcharge for which antitrust recovery is sought is between 20% and 50%).

22.     Based upon the small amount of each overcharge that Plaintiff would need to allege against Transitions to reach the amount in controversy before trebling, and the even smaller amount of each overcharge after trebling and attorneys' fees are included, the amount in controversy plainly exceeds that required by the law for this Court to have original jurisdiction over this case. *See In re Online DVD Rental Antitrust Litig.*, 2009 WL 1955796, at *1 (N.D. Cal. July 6, 2009) (evidence that only a small overcharge per DVD unit sold would meet amount in controversy held sufficient to remove antitrust class action).

23.     Furthermore, because the treble damages Plaintiff claimed in the complaint are a type of punitive damages under Wisconsin law, and Plaintiff is entitled to those damages under state law, this Court has subject matter jurisdiction "unless it is clear beyond a legal certainty that plaintiff would under no circumstances be entitled to recover the jurisdictional amount." *West Bend Elevator v. Rhone-Poulenc*, 140 F.Supp.2d at 967-68. Because nothing in Plaintiff's factual allegations suggests that the putative class of plaintiffs would be legally barred from recovering over $5 million, the amount in controversy exceeds that required by the law for this Court to have original jurisdiction over this case.

### **Minimal Diversity**

24.     Minimal diversity exists pursuant to 28 U.S.C. § 1332(d)(2).

25.     Transitions is today, and was at the time the complaint was filed, a Delaware corporation with a principal place of business in Pinellas Park, Florida. A

corporation "shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Therefore, Transitions is a citizen of Delaware and Florida. *See* Cole Decl. ¶ 2.

26. The Supreme Court has held that "[i]n order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States and be domiciled within the State." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989).

27. The purported class of plaintiffs includes "[a]ll persons or entities in Wisconsin who acquired for their own use, and not for resale, photochromic lenses manufactured and/or distributed by one or more of the Defendants, or their agents or entities under their control, at any time from January 1, 1999 to the present (the "Class")." Compl. ¶ 12.

28. Because the putative class consists of persons in the state of Wisconsin, which includes citizens of the state of Wisconsin, and Transitions is not a citizen of Wisconsin, minimal diversity exists in this case.

Dated:  April 19, 2010.

Respectfully Submitted,

BY:  s/Elizabeth A. N. Haas

James T. McKeown (WBN 1010602)
Elizabeth A. N. Haas (WBN 1059028)
Foley & Lardner, LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Telephone:  (414) 271-2400
Facsimile:  (414) 297-4900
Email:  jmckeown@foley.com

*Counsel for Defendant Transitions Optical, Inc.*

*Of Counsel*:

Jonathan M. Jacobson (to be admitted *pro-hac vice*)
Chul Pak (to be admitted *pro-hac vice*)
Wilson Sonsini Goodrich & Rosati,
Professional Corporation
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Telephone:  (212) 497-7700
Facsimile:  (212) 999-5899
E-mail:  jjacobson@wsgr.com
         cpak@wsgr.com

Renata B. Hesse (to be admitted *pro-hac vice*)
Wilson Sonsini Goodrich & Rosati,
Professional Corporation
1700 K Street, NW
Fifth Floor
Washington, D.C.  20006
Telephone:  (202) 973-8800
Facsimile:  (202) 973-8899
Email:  rhesse@wsgr.com

**NOTICE OF REMOVAL EXHIBIT 1**

10CV003808

**STATE OF WISCONSIN**   **CIRCUIT COURT**   **MILWAUKEE COUNTY**

**CIVIL DIVISION**

| | |
|---|---|
| Axhi Sabani, individually and on behalf of all others similarly situated, ) ) ) | HON. THOMAS R. COOPER, BR. 28 CIVIL N |
| 1218 St. James Ct. Madison, WI 53715 ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No. _____ |
| ) | Classification Code: 30303 |
| TRANSITIONS OPTICAL, INC., 9251 Belcher Road Pinellas Park, Florida 33782 ) ) ) ) | |
| and DOES 1 – 20, inclusive, ) ) | |
| Defendants. ) ) | |

TRUE COPY
SERVED
DATE: 4/1/10
TIME: 4V
BY: 10:30AW
2599
CERTIFIED / SHERIFF
APPOINTED PROCESS
SERVER
6 CIRCUIT

**TO:**   TRANSITIONS OPTICAL, INC.

   9251 Belcher Road

   Pinellas Park, Florida 33782

FILED AND
AUTHENTICATED

MAR 1 6 2010

JOHN BARRETT
Clerk of Circuit Court

**SUMMONS**

You are hereby notified that the Plaintiffs named above have filed a lawsuit or other legal

action against you. The Complaint, which is attached, states the nature and basis of the legal

action.

Within forty-five (45) days of receiving this Summons, you must respond with a written

Answer, as that term is defined in Chapter 802 of the Wisconsin Statutes, to the Complaint. The

Court may reject or disregard an Answer that does not follow the requirements of the Statutes.

The Answer must be sent or delivered to the Court, whose address is: Clerk of Courts, 901 North 9th Street, Milwaukee, Wisconsin 53223, and to Plaintiffs' attorney, whose address is Ademi & O'Reilly, LLP, 3620 East Layton Avenue, Cudahy, Wisconsin 53110.

If you do not provide an answer within forty-five (45) days, the Court may grant Judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A Judgment may be enforced as provided by law. A Judgment awarding money may become a lien against any real estate you own now or in the future and may also be enforced by garnishment or seizure of property.

Dated this 16th day of March, 2010.

Respectfully Submitted,

ADEMI & O'REILLY, LLP

Guri Ademi, (SBN 1021729)
Shpetim Ademi (SBN 1026973)
David J. Syrios (SBN 1045779)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: 866.264.3995
Tel: 414.482.8000
Fax: 414.482.8001

*Attorneys for Plaintiff*

2

STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY

CIVIL DIVISION

| | |
|---|---|
| Axhi Sabani, individually and on behalf of all others similarly situated, | ) ) ) |
| 1218 St. James Ct. Madison, WI 53715 | ) ) Civil Action No. _____ ) Classification Code: 30303 |
|      Plaintiff, | ) ) |
|    v. | ) ) ) |
| TRANSITIONS OPTICAL, INC., 9251 Belcher Road Pinellas Park, Florida 33782 | ) ) ) ) |
| and DOES 1 – 20, inclusive, | ) ) ) |
|      Defendants. | ) ) |

> **FILED**
>
> MAR 1 6 2010
>
> JOHN BARRETT
> Clerk of Circuit Court

**CLASS ACTION COMPLAINT**

Plaintiff Axhi Shabani ("Plaintiff"), individually and on behalf of all others similarly situated, complains as follows:

### NATURE OF CLAIM

1.      This antitrust class action is brought under the Wisconsin Antitrust Law, Wis. Stat. §133.01, *et. seq.*, Wis. Stats., to recover treble damages, injunctive relief, and the costs of suit, including reasonable attorneys' and experts' fees, for the injuries to Plaintiff and members of the proposed Class he seeks to represent. The allegations set forth below are based upon information and belief pursuant to the investigation of counsel.

2.      Plaintiff brings this class action under the laws of Wisconsin for damages for injuries sustained as a result of defendants Transitions Optical, Inc.'s ("Transitions") and Does 1-20's (collectively referred to as "Defendants") exclusionary acts and practices in the photochromic lens industry. Transitions has improperly maintained its monopoly power by engaging in exclusionary acts and practices, which include entering into exclusive dealing arrangements that foreclose its rivals from key distribution channels. Transitions' conduct has led to higher prices, lower output, reduced innovation and diminished consumer choice in Wisconsin.

3.      Consumers of corrective ophthalmic lenses (lenses used in eyeglasses to correct vision defects) may purchase those lenses with the option of an add-on photochromic treatment, which protects eyes from harmful ultraviolet ("UV") light. A "photochromic lens," or a corrective ophthalmic lens with a photochromic treatment, will darken when it is exposed to the UV light present in sunlight, and fade back to clear when it is removed from the UV light. As defined herein, "photochromic lenses" means "ophthalmic lenses subject to photochromic treatments."

4.      The purpose and effect of this illegal conduct has been to deny purchasers of photochromic lenses of a competitive price.

5.      These claims are prosecuted by a class of Wisconsin indirect purchasers of photochromic lenses manufactured and/or distributed by one or more of the Defendants. The class includes all persons and entities who, at the time of purchase, resided in or were incorporated in Wisconsin, and who, on or after January 1, 1999, were an indirect purchasers of photochromic lenses manufactured and/or distributed by one or more of the Defendants, and who did not purchase such photochromic lenses for the purpose of resale.

2

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to the Wisconsin Antitrust Law, Wis. Stat. §133.01, *et. seq.*, Wis. Stats.. This Court has personal jurisdiction over Defendants pursuant to § 801.05, *et. seq.*, Wis. Stats.  This Court also has jurisdiction over Defendants because they are authorized to conduct, and in fact do conduct, substantial business in the State of Wisconsin. Defendants have sufficient minimum contacts with Wisconsin or otherwise intentionally avail themselves of the consumer markets within Wisconsin through the promotion, sale, marketing and/or distribution of their products in Wisconsin to render the exercise of jurisdiction by the Wisconsin courts permissible under traditional notions of fair play and substantial justice. Venue is appropriate in Milwaukee County pursuant § 801.50(2)(d) Wis. Stat..

7. This complaint is not based upon federal law or any federal question.  No claim for relief is made under federal law and Plaintiff's state law causes of action are not federally pre-empted. The amount in controversy for each named Class representative and each absent Class member does not exceed, inclusive of interest, fees and costs, the sum or value of $75,000.00.  Plaintiff's state law causes of action mandate that this case be heard in a State of Wisconsin forum.

8. Venue is proper in this County pursuant to §801.50(2), Wis. Stats., as the acts upon which this action is based occurred in part in this County.  Plaintiff and numerous Class members reside in this County and purchased photochromic lenses, and were thereby injured in this venue. Defendants received substantial compensation and profits from sales of such products in this County. Thus, Defendants' liability arose in part in this County.

3

**PARTIES**

*Plaintiff*

9.      Plaintiff Axhi Shabani is a resident of Madison, Wisconsin and purchased photochromic lenses manufactured and/or distributed by one or more of the Defendants in the State of Wisconsin during the Class Period (as defined below).

*Defendants*

10.      Defendant Transitions Optical, Inc. is a corporation organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 9251 Belcher Road, Pinellas Park, Florida 33782. Transitions develops, manufactures and sells photochromic treatments for corrective ophthalmic lenses.

11.      The true names and capacities of defendants DOES 1-20 are unknown to Plaintiff, and are sued by such fictitious names pursuant to § 807.12, Wis. Stats. Each of such fictitiously named defendants has participated or acted in concert or in furtherance of the violations alleged herein and has performed acts and made statements in furtherance thereof. When and if Plaintiff learns the identity of such persons, Plaintiff will amend this Complaint to show such defendant's true name and capacity.

**CLASS ACTION ALLEGATIONS**

12.      Plaintiff brings this action pursuant to Wis. Stat. §803.08, individually and on behalf of the class defined below. The relevant time period for the class is January 1, 1999 to the present ("the Class Period"). The Class is defined as follows:

> All persons or entities in Wisconsin who acquired for their own use, and not for resale, photochromic lenses manufactured and/or distributed by one or more of the Defendants, or their agents or entities under their control, at any time from January 1, 1999 to the present (the "Class").

4

13.     The Class excludes Defendants and their co-conspirators, parents, subsidiaries and affiliates. Also excluded are all federal, state, or local governmental entities, and any judge or judicial officer presiding over this matter.

14.     The Class is so numerous that joinder of all members is impracticable. There are thousands of members of the Class who are geographically dispersed.

15.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members were injured by the same wrongful conduct of Defendants as alleged herein.

16.     There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. Such common questions include, but are not limited to:

 (a) Whether Defendants monopolized, or attempted to monopolize, the development, manufacture and sale of photochromic lenses, resulting in the artificial and illegal inflation of the prices of photochromic lenses;

 (b) Whether Defendants violated the Wisconsin Antitrust Law, Wis. Stat. §133.01, *et. seq.*, Wis. Stats.;

 (c) Whether Defendants engaged in exclusionary acts and practices, which include, but are not limited to, entering into exclusive dealing arrangements that foreclose their rivals from key distribution channels.

 (d) The existence, duration, and illegality of monopolization, attempted monopolization, and/or the exclusive dealing arrangements alleged herein;

5

(e)     Whether the prices charged for photochromic lenses in the State of Wisconsin during the Class Period were artificially inflated as a result of Defendants' monopolization, attempted monopolization, and/or the exclusive dealing arrangements alleged herein;

(f)     The amount by which Defendants' illegal, unfair or deceptive trade practices have inflated the price of photochromic lenses over the amount they would have been in a competitive market unaffected by Defendants' illegal acts;

(g)     The effect and extent of injuries sustained by Plaintiff and members of the Class, and the appropriate type and/or measure of damages;

(h)     Whether Defendants took affirmative steps to conceal the exclusive dealing arrangements alleged herein; and

(i)     Whether Plaintiff and the members of the Class are entitled to declaratory and/or injunctive relief.

17.     As the claims of Plaintiff are typical of the claims of the Class, and Plaintiff has no interest adverse to or which irreconcilably conflicts with the interests of other members of the Class, Plaintiff is an adequate class representative.

18.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced and competent in the prosecution of complex class action litigation.

19.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy and substantial benefits will derive from proceeding as a class action. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions engender. Class treatment will also permit

6

the adjudication of relatively small claims by many Class members who could not afford to individually litigate such claims against large corporate defendants. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient group-wide adjudication of this controversy.

## RELEVANT MARKET

20.     The relevant product market is no broader than the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses. The relevant geographic market is the United States.

21.     Consumers of corrective ophthalmic lenses (lenses used in eyeglasses to correct vision defects) may purchase those lenses with the option of an add-on photochromic treatment, which protects eyes from harmful ultraviolet ("UV") light. A "photochromic lens," or a corrective ophthalmic lens with a photochromic treatment, will darken when it is exposed to the UV light present in sunlight, and fade back to clear when it is removed from the UV light.

22.     Each year, U.S. consumers purchase roughly 76 million pairs of corrective ophthalmic lenses. In 2008, photochromic lenses represented approximately 18-20% of all corrective ophthalmic lens sales in the United States, totaling approximately $630 million in sales at the wholesale level.

23.     There are no close substitutes for photochromic lenses, and no other product significantly constrains the prices of photochromic lenses. Photochromic lenses have characteristics and uses distinct from those of clear corrective ophthalmic lenses, polarized lenses (which are designed to remove glare), or fixed-tint lenses (*e.g.*, prescription sunglasses).

7

## TRANSITIONS HOLDS MONOPOLY POWER IN THE RELEVANT MARKET

24.     Transitions possesses monopoly power in the relevant market. Transitions' share of the relevant market has been at least 80 percent during each of the past five years. In 2008, Transitions' market share was over 85 percent.

25.     Significant and lasting barriers make entry into the relevant market difficult. These barriers include, but are not limited to: (i) product development costs; (ii) capital requirements; (iii) intellectual property rights; (iv) regulatory requirements; and (v) Transitions' unfair methods of competition.

26.     Transitions' monopoly power is also demonstrated directly by its ability to exclude competitors and to control prices. The indicia of Transitions' monopoly power include, but are not limited to, the ability of Transitions: (i) to coerce lens casters, which manufacture and distribute corrective ophthalmic lenses, to accept exclusive dealing arrangements; (ii) to price its product without regard to its competitors' prices; (iii) to impose significant price increases; and (iv) to withhold a desired product – a low-priced, private label photochromic lens – from consumers in the United States, even though Transitions supplies it in other markets.

## VIOLATIONS ALLEGED

27.     Beginning in 1999 and continuing through to today, Transitions has engaged in unfair methods of competition that foreclose key distribution channels for existing rivals and impede market entry by potential rivals. Transitions has engaged in acts and practices that, when considered individually and collectively, have the effect of improperly maintaining Transitions' monopoly power in the relevant market. Transitions' exclusionary actions have caused injury to competition and to consumers. Transitions' conduct is likely to continue to harm competition absent the relief requested herein, in violation of Wis. Stat. §133.01, *et. seq.*

8

## A. The Photochromic Lens Industry

28.     Transitions partners with lens casters to produce its photochromic lenses. Specifically, lens casters supply the corrective ophthalmic lenses to Transitions, and Transitions uses proprietary processes to apply patented photochromic dyes or other photochromic materials to the lens. Transitions then sells the lenses, now photochromic, back to the original lens casters. Lens casters are Transitions' only direct customers.

29.     Nearly 100 percent of all photochromic lenses are first sold and/or produced by lens casters. Attempts to bypass lens casters by fabricating photochromic lenses at lower levels of the supply chain (*e.g.*, the wholesale optical laboratories or optical retailers) have largely been abandoned as uneconomical.

30.     Lens casters sell and distribute these photochromic lenses alongside their clear corrective ophthalmic lenses. Lens casters sell these lenses through two distribution channels: wholesale optical laboratories ("wholesale labs") and optical retailers ("retailers"), each of which represents approximately one half of the downstream market.

31.     Wholesale labs sell ophthalmic lenses, including photochromic lenses, to ophthalmologists, opticians and optometrists (collectively known as "eye care practitioners") who are not affiliated with retailers. The wholesale labs grind the lens according to a lens prescription, fit the lens into an eyeglass frame, and deliver the frame with the finished lens to the eye care practitioner. In addition to these laboratory functions, a wholesale lab will often employ a sales force to promote specific lenses to eye care practitioners. Photochromic lens suppliers, such as Transitions, use wholesale labs and their sales forces to market their lenses because wholesale labs are the most efficient means for a photochromic lens supplier to promote

9

and sell its products to the tens of thousands of independent eye care practitioners prescribing photochromic lenses to consumers.

32.     There has been considerable consolidation in the wholesale lab channel in recent years as lens casters have begun to acquire wholesale labs. Lens casters generally have used these wholesale labs to sell and promote primarily their own brand of lenses.

33.     Retailers represent the other important distribution channel for photochromic lenses, and include national, regional and smaller retail chains. Retailers generally provide both eye care practitioner and laboratory services. They employ their own eye care practitioners who deal directly with consumers. In addition, retailers grind and fit lenses into eyeglass frames and deliver the frame with the finished lens to the consumer. Because retailers employ their own eye care practitioners, the retail channel is generally a more efficient means for promoting and selling photochromic lenses to consumers than comparable efforts through the wholesale lab channel. For example, a decision by the corporate headquarters of one retail chain to buy a specific photochromic lens can have an immediate impact on the prescribing behavior of all the practitioners who are employed by that retailer. The retail channel has also witnessed significant consolidation over time.

### B.  Transitions' Exclusive Dealing with Lens Casters

34.     In 1999, Corning Inc. ("Corning") introduced a new plastic photochromic lens, Sunsensors, which was a direct challenge to Transitions. Transitions responded to this competitive threat by terminating the first lens caster that began selling the new SunSensors lens, Signet Armorlite, Inc. ("Signet"), and by adopting a general policy not to deal with any lens caster that sold or promoted a competing photochromic lens. Transitions continues to enforce this policy by, among other things, entering into agreements with certain lens casters that

10

expressly require exclusivity and by publicizing its exclusive dealing policy. Accordingly, even lens casters that have not signed exclusive agreements with Transitions have a clear and well-founded understanding that Transitions will refuse to deal with them if they sell or promote a competing photochromic lens. This understanding is reinforced by Transitions' acts and practices, including but not limited to, the following:

(a) Transitions terminated Signet when it began selling a competing photochromic lens, SunSensors;

(b) Transitions announced its policy to deal only with exclusive lens casters;

(c) Transitions threatened to terminate other lens casters that did not initially agree to sell Transitions' photochromic lenses on an exclusive basis; and

(d) Transitions terminated another lens caster, Vision-Ease Lens ("Vision-Ease"), because Vision-Ease planned to sell a competing photochromic lens, LifeRx, that it had developed for use on its own ophthalmic lenses.

35.    Given Transitions' dominant market position and practice of demanding exclusivity, lens casters face powerful economic incentives to deal with Transitions on an exclusive basis. Transitions' "all-or-nothing" exclusivity policy ensures that lens casters that want to sell a competing photochromic lens will be forced to forgo significant revenues from the sale of Transitions' products, which can represent up to 40 percent of a lens caster's overall profit. In addition, a lens caster's inability to offer Transitions' photochromic lenses is likely to jeopardize significant sales of its clear corrective ophthalmic lenses as well, because many chain

11

retailers and wholesale labs (and their eye care practitioner customers) prefer to buy both clear and photochromic versions of the same lens.

36. Transitions' exclusionary acts and practices exclude rival suppliers of photochromic treatments that need to partner with lens casters to bring their product to market, such as Corning. For example, no major lens caster has been willing to sell the SunSensors plastic photochromic lens since Transitions terminated Signet. Without access to effective distribution, Corning has been unable to pose a competitive threat to Transitions' monopoly, and has had little incentive to invest in research and development to further innovate and improve its product.

37. Transitions' exclusionary acts and practices also erect significant barriers to entry by the lens casters themselves, which can supply their own ophthalmic lenses. Some lens casters would likely develop their own competing photochromic lens absent Transitions' exclusionary conduct. Only one lens caster, Vision-Ease, has been able to resist Transitions' coercion and introduce a new photochromic lens, LifeRx . However, Vision-Ease was only able to do so after it entered into secret negotiations with one of the largest optical retailers in the United States. This large retailer's commitment to buy LifeRx allowed Vision-Ease to secure enough business to replace its lost Transitions sales. Since Transitions terminated Vision-Ease for introducing LifeRx in 2005, no other lens caster has introduced a new line of photochromic lenses in the United States.

38. Lens casters that are exclusive to Transitions collectively account for over 85% of the photochromic lens sales in the United States.

12

*C. Transitions' Exclusive and Restrictive Dealing with Retailers and Wholesale Labs*

39.     Transitions has also entered into exclusive and other restrictive agreements with its indirect customers: retailers and wholesale labs. These agreements foreclose downstream outlets for photochromic lenses and create significant barriers to entry.

40.     Transitions has entered into exclusive agreements with retailers with the purpose and effect of impeding entry into the relevant market. For example, after terminating Vision-Ease for developing and selling a competing photochromic lens, Transitions entered into exclusive contracts with over 50 retailers, including many of the largest retail chains. Most of these exclusive agreements were of long duration and could not be easily terminated. Transitions' conduct deprived Vision-Ease of access to many large retailers (one of the most efficient channels of distribution for photochromic lenses to consumers), which blunted the force of its entry into the market and diminished the ability of Vision-Ease to constrain Transitions' exercise of monopoly power. Potential entrants observed Transitions' exclusionary campaign and were deterred from entering the market

41.     Transitions' agreements with wholesale labs restrict the ability of rivals to promote and sell their photochromic lenses to independent eye care practitioners unaffiliated with a retail chain. For example, Transitions has entered into over 100 agreements with wholesale labs, including 23 of the top 30 independent wholesale labs, that require the wholesale lab to sell Transitions' lenses as its "preferred" photochromic lens and not to promote any competing photochromic lens. The anticompetitive impact of these wholesale lab agreements is augmented by Transitions' exclusive policies with lens casters – at least 50 percent of all wholesale labs are owned by lens casters that sell Transitions' photochromic lenses on an

13

exclusive basis. As a result, rival suppliers of photochromic treatments have only limited access to these lens caster-owned wholesale labs as well.

42.     Additionally, Transitions' agreements with retailers and wholesale labs generally provide a discount only if the customer purchases all or almost all of its photochromic lens needs from Transitions. Because no other supplier has a photochromic treatment that applies to a full line of ophthalmic lenses, Transitions' discount structure impairs the ability of rivals to compete for sales to these customers. It also erects a significant entry barrier by limiting the ability of a rival to enter the market with a new photochromic treatment that applies to less than a full line of ophthalmic lenses.

43.     Transitions' exclusive and restrictive agreements with indirect customers deprive its rivals of access to outlets for the distribution and sale of competing photochromic lenses, and impair their ability to compete effectively with Transitions or to pose a significant threat to its monopoly. These agreements also deter incremental entry by a supplier with a photochromic treatment that applies to less than the full line of ophthalmic lenses, and reinforce and strengthen the barriers to entry erected by Transitions' policy of requiring that lens casters deal exclusively with Transitions. Transitions' exclusionary practices foreclose its rivals, in whole or in part, from a substantial share – as much as 40 percent or more – of the entire downstream photochromic lens market.

### D. *Federal Trade Commission Action and Consent Order*

44.     On March 3, 2010, the United States Federal Trade Commission ("FTC") announced that it had entered into a Consent Order (the "Order") with Transitions pursuant to which Transitions "agreed to stop using allegedly anticompetitive practices to maintain its monopoly and increase prices" and, more specifically, "agreed to a range of restrictions,

14

including an agreement to stop all exclusive dealing practices that pose a threat to competition."
The Order is attached hereto as Exhibit A.

45.     The Order, which is in effect for 20 years, bars Transitions from the following illegal and unfair trade practices:

(a)     "[P]utting any agreements or policies in place that limit customers' ability to buy or sell a competing photochromic treatment, or that require customers to give Transitions' products more favorable treatment than a competitor's products";

(b)     "[L]imiting the information that its customers give to consumers about competing photochromic treatments";

(c)     "[I]mposing exclusivity on individual product brands of eyeglass lenses, ensuring that lens casters and others can sell competing photochromic treatments on the same brands of products that they also sell with Transitions' treatments";

(d)     For a period of 10 years, offering or imposing the following types of discounts to customers: (I) "market share discounts that are based on what percentage of a customer's photochromic lens sales are Transitions' lenses,"(II) "discounts that are applied retroactively once a customer's sales reach a specific threshold. For example, Transitions cannot provide discounts on the first 999 units that are contingent on the customer purchasing the one-thousandth unit." (III) "bundling discounts so that customers

15

purchasing more than one line of photochromic lenses obtain additional discounts;" and

(e) "[R]etaliating against a customer that buys or sells Transitions' lenses on a non-exclusive basis."

## ANTICOMPETITIVE EFFECTS OF TRANSITIONS' CONDUCT

46. The acts and practices of Transitions, as alleged herein, have the purpose, capacity, tendency, and effect of impairing the competitive effectiveness of Transitions' rivals in the relevant market, and of significantly raising barriers to entry for potential rivals. Transitions' conduct reasonably appears capable of making a significant contribution to the enhancement or maintenance of Transitions' monopoly power.

47. Transitions' conduct adversely affects consumers by:

(a) increasing the prices and reducing the output of photochromic lenses;

(b) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales in the photochromic lens market;

(c) reducing innovation; and

(d) reducing consumer choice among competing photochromic lenses.

48. Additionally, by effectively stifling competition, Transitions has been able to refuse to supply its low-priced, private label photochromic lens in the U.S. market, notwithstanding considerable consumer demand for such a product. Transitions offers this product for sale outside the United States where it faces more competition.

16

49.     There are no legitimate procompetitive efficiencies that justify Transitions' conduct or outweigh its substantial anticompetitive effects.

## INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

50.     During the period covered, Plaintiff and the other members of the Class paid inflated prices for photochromic lenses. By reason of the alleged violations of the antitrust laws, Plaintiff and the other members of the Class paid higher prices for photochromic lenses than they would have paid in the absence of the illegal trade practices and, as a result, have been injured and have suffered damages in an amount presently undetermined.

51.     The specific amounts of damages have not yet been determined because such determination will require discovery. When these amounts have been determined, Plaintiff will seek leave of Court to amend this Complaint to include such amounts.

## FRAUDULENT CONCEALMENT

52.     The running of any statute of limitations has been suspended with respect to any claims that Plaintiff and the other members of the Class have sustained as a result of the unlawful combination and conspiracy alleged herein and with respect to their rights to injunctive relief by virtue of the federal doctrine of fraudulent concealment. Defendants, through various devices and techniques of secrecy, affirmatively and fraudulently concealed the existence of the unlawful combination and conspiracy alleged herein.

## COUNT I
## VIOLATION OF WISCONSIN ANTITRUST LAW § 133.01, *ET. SEQ.*, WIS. STATS

53.     Plaintiff incorporates by reference the allegations above and adopt same as though fully set forth herein.

54.     Defendants and un-named conspirators have engaged in illegal, unfair or deceptive trade practices, including, but not limited to, entering into exclusive dealing

17

arrangements in an unreasonable restraint of trade in violation of the Wisconsin Antitrust Law, §

133.01, *et. seq.*, Wis. Stats.

55.     The illegal, unfair or deceptive trade practices alleged herein have resulted in the

prices for photochromic lenses to be illegally inflated.  The illegal, unfair or deceptive trade

practices alleged herein violate Wisconsin Antitrust Law, § 133.01, *et. seq.*, Wis. Stats., and are

at a minimum an unreasonable and unlawful restraint of trade.

56.     As result of Defendants' unlawful conduct, Plaintiff has sustained damage by

paying supra-competitive prices that he would not have had to incur but for the unlawful conduct

of Defendants, as alleged herein, and is entitled to recover from Defendants the full consideration

paid for photochromic lenses under § 133.14, Wis. Stats., and treble damages and equitable relief

pursuant to § 133.18, Wis. Stats.

### COUNT II
### (FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE
### TRUST FOR UNJUST ENRICHMENT BY DEFENDANTS)

57.     Plaintiff repeats and re-allege the preceding and subsequent paragraphs as though

set forth herein.

58.     As a result of their unlawful conduct described above, Defendants have been and

will continue to be unjustly enriched.  Defendants have been unjustly enriched to the detriment

of Plaintiff and the Class by the receipt of, at a minimum, unlawfully inflated prices and illegal

profits on their photochromic lenses paid for by Plaintiff and the Class.  Defendants have

benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to

retain any of their ill-gotten gains.

59.     Plaintiff and the Class are entitled to the amount of Defendants' ill-gotten gains

resulting from Defendants' unlawful, unjust and inequitable conduct.  Plaintiff and the Class are

18

entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the Class may make claims on a *pro rata* basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray that:

a.     The Court determines that this action may be maintained as a class action under Wis. Stat. §803.08;

b.     The illegal, unfair or deceptive trade practices, including, but not limited to, monopolization, attempted monopolization, and/or exclusive dealing arrangements, alleged herein be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Wisconsin Antitrust Law, § 133.01, *et. seq.*, Wis. Stats.;

c.     Plaintiff and each and every member of the Class recover damages, as provided by law, determined to have been sustained by each of them, and that joint and several judgments in favor of Plaintiff and each and every member of the Class, respectively, be entered against Defendants, in an amount to be trebled in accordance with antitrust laws, and each of them;

d.     Defendants be enjoined from continuing the illegal, unfair or deceptive trade practices alleged herein;

e.     Plaintiff and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, expert fees, and accountant's fees, as provided by law; and

f.     Plaintiff and the other members of the Class be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial for all individual and Class claims so triable.

Dated: March 16, 2010

19

ADEMI & O'REILLY, LLP

By: _____

Guri Ademi       (State Bar No. 1021729)
Shpetim Ademi  (State Bar No. 1026973)
David Syrios (State Bar No. 1045779)
3620 Layton Avenue
Cudahy, Wisconsin 53110

Telephone:     (414) 482-8000
Fax No.:          (414) 482-8001

*Attorneys for Plaintiff*

*Of Counsel:*

Ben Barnow (to be admitted *pro-hac vice*)
Blake A. Strautins (to be admitted *pro-hac vice*)
Barnow and Associates, P.C.
1 North LaSalle, Suite 4600
Chicago, IL 60602
Telephone:     (312) 621-2000
Fax No.:          (312) 641-5504

20